UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


MORGANTOWN ENERGY ASSOCIATES,

　　　　Plaintiff,

v.                                    Civil Action No. 2:12-cv-6327

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and
MICHAEL A. ALBERT, in his official capacity as
Chairman of the Public Service Commission, and
JON W. MCKINNEY, in his official capacity as
Commissioner of the Public Service Commission, and
RYAN B. PALMER, in his official capacity as
Commissioner of the Public Service Commission, and
MONONGAHELA POWER COMPANY and
THE POTOMAC EDISON COMPANY,

　　　　Defendants.


## MEMORANDUM OPINION AND ORDER

　　　　Pending is the motion to dismiss by defendants Public Service Commission of West Virginia, and Commissioners Michael A. Albert, Chairman, Jon W. McKinney, and Ryan B. Palmer (collectively, "the Commission"), filed December 7, 2012.  Also pending is the motion for judgment on the pleadings by defendants Monongahela Power Company ("Mon Power") and The Potomac Edison Company ("Potomac Edison" and together with Mon Power, "the Utilities"), filed January 25, 2013.


　　　　The plaintiff, Morgantown Energy Associates ("MEA"), is a general partnership with a principal place of business in

Morgantown, West Virginia.  Compl. ¶ 7.  MEA is engaged in generating electric power from alternative energy resources which it sells to electric utilities.  Compl. ¶¶ 19, 41.  The Public Service Commission is an administrative agency of the State of West Virginia, having the "authority and duty to enforce and regulate the practices, services and rates of public utilities."  W. Va. Code § 24-1-1(a).  Mon Power is an electric utility in West Virginia and Potomac Edison is its sister company.  Id. ¶ 12.

## I. Background

This case arises from a dispute over ownership of alternative and renewable energy credits (commonly called "RECs," or "credits") that are a relatively recent creature of state law. Here, the credits relate to electric energy provided by MEA to the Utilities under a pre-existing 1989 contract that runs until 2027, pursuant to federal law.

Congress enacted the Public Utility Regulatory Policies Act ("PURPA") in 1978, in the wake of the energy crisis of the 1970s, to promote greater use of domestic alternative and renewable energy and to decrease the nation's dependence on foreign oil. Pub. L. No. 95-617, 92 Stat. 3117; FERC v. Mississippi, 456 U.S. 742, 746 (1982).  Under PURPA, certain facilities that produce electricity in nontraditional ways are designated as "qualified facilities" ("QFs").  16 U.S.C. § 824a-3.  Rulemaking power to

encourage proliferation of QFs is generally held by the Federal
Energy Regulatory Commission ("FERC"), while state regulatory
commissions are charged with implementing[1] those rules.  16 U.S.C.
824a-3(a, f).  Under PURPA, utilities must purchase any electricity
made available to them by a QF at a special price called the
"avoided cost" rate.  Id.; 18 C.F.R. §§ 292.303-304.  The avoided
cost rate is a rate equal to the costs that the utility would have
incurred from generating the electricity or purchasing the
electricity from another source.  16 U.S.C. § 824a-3(d); 18 C.F.R.
§§ 292.101(b)(6), 292.303.  The contracts by which utilities
purchase electricity supplied by a facility, whether or not it is a
QF, are commonly called electric energy purchase agreements ("EEP
Agreements" or "EEPAs") or power purchase agreements ("PPAs").


        West Virginia is among that states that, independent of
PURPA, have enacted their own laws to "encourage the development of
more efficient, lower-emitting and reasonably priced alternative
and renewable energy resources."  W. Va. Code §§ 24-2F-1, 24-2F-
2(3).  West Virginia's Alternative and Renewable Energy Portfolio
Act ("the W.Va. Portfolio Act" or "the Portfolio Act") was enacted
in 2009, and tasks the Public Service Commission with rulemaking to

---

[1] The contours of the state commission's power to "implement" the
regulations are discussed infra, Part III.B, pp. 36-43.

"establish a system of tradable credits to establish, verify and monitor the generation and sale of electricity generated from alternative and renewable energy resources facilities." Id. § 24-2F-4(a).  A "qualified facility" under PURPA is not necessarily an "alternative and renewable energy resource" facility under the Portfolio Act, and vice versa.  The two classification schemes operate independently of one another and do not have the same requirements.

The Portfolio Act awards one REC to electric utilities for each megawatt hour of electricity purchased or generated from specified alternative energy resource facilities.  Id. § 24-2F-4(b)(1-2).  Utilities earn two RECs for each megawatt hour from specified renewable energy resource facilities.  Id. § 24-2F-4(b)(2).  The specified facilities include those located within West Virginia, such as MEA's Morgantown facility.  These state-created credits can be accumulated for use in years to come. Beginning in 2015, the Portfolio Act requires electric utilities to own RECs in amounts equal to at least 10 percent of the energy they sold to West Virginia retail customers in the preceding calendar year.  Id. § 24-2F-5(d)(1).  The requirement increases to 15 percent in 2020, and settles at 25 percent in 2025.  Id. § 24-2F-5(c), (d)(1-2).  If a utility cannot meet its requirement for a given year, the Commission will assess a per-credit penalty of at

4

least the lesser of 200 percent of the average market value of a credit or 50 dollars. Id. § 24-2F-5(g). In meeting the Portfolio Act requirements, RECs may not be used more than once, but excess RECs may be carried over for use in future years. Id. § 24-2F-5(b, f).

On November 5, 2010, the Commission issued General Order No. 184.25, setting forth final rules for the Portfolio Act. The final rules provide that RECs may be obtained from non-utility generators of electricity from alternative and renewable resources, such as the plaintiff, MEA, either by purchasing the credits and the energy bundled together or by purchasing the credits independently, unbundled from the energy. W. Va. Code R. § 150-34-5.6.

This dispute concerns a circumstance that the final rules do not directly address: who should own the credits when a non-utility QF sells electricity to utilities through an EEPA that predates the Portfolio Act and consequently does not specify who owns the credits? On November 22, 2011, the Commission issued an order ("the Commission Order") that assigned the credits to the purchasing utilities. In this case, the court is asked to consider whether the Commission violated PURPA or otherwise erred in making that determination.

5

## A. Federal Statutory Framework

As noted, PURPA created a class of electricity generating facilities known as "qualified facilities," or "QFs". QFs include cogeneration,[2] biomass, waste, and renewable resource facilities. See 16 U.S.C. § 824a-3. In addition to meeting any regulatory requirements for energy output or the manner in which energy is generated, a facility must also be certified to be a QF.[3] If a facility does not seek certification, even if it would meet all of the other requirements necessary to be a qualified facility, it is not a "qualified facility" under the regulations. A facility may either file a notice of self-certification with FERC or apply directly to FERC for certification. 18 C.F.R. § 292.203. Whether to seek QF certification is up to the facility, as no part of PURPA or the FERC regulations requires an otherwise qualified facility to do so. See generally 16 U.S.C. §§ 824-824a-3; 18 C.F.R. §§ 292.101-292.602. The plaintiff, MEA, is a qualified facility.

---

[2] A "cogeneration" facility is one that produces both electric energy and steam or some other form of energy useful for "industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796.

[3] There is an exception: "Any facility with a net power production capacity of 1 MW or less is exempt from the filing requirements." 18 C.F.R. § 292.203(d).

To encourage the development of QFs, PURPA obligates electric utilities to buy any electricity made available by a QF at the avoided cost rate.  The QF may sell power on an "as available" basis, in which case the purchasing utility will buy at the avoided cost rate at the time of purchase.  18 C.F.R. § 292.304(d)(1).  Alternatively, the QF can enter into a contract with a utility (known as EEPAs or PPAs), where the price may be either the avoided cost at the time of contracting or the avoided cost at the time of delivery.  18 C.F.R. § 292.304(d)(2).

PURPA directs the Federal Energy Regulatory Commission ("FERC") to prescribe "such rules as it determines necessary to encourage cogeneration and small power production."  PURPA § 210(a), 16 U.S.C. § 824a-3(a).  Section 210(f), headed "Implementation of rules for qualifying cogeneration and qualifying small power production facilities," then directs "each State regulatory authority" to "implement such [FERC] rule (or revised rule) for each electric utility for which it has ratemaking authority."  Id. § 210(f), 16 U.S.C. § 824a-3(f).

PURPA § 210(e) instructs FERC to prescribe rules exempting qualifying facilities from certain federal and state utility regulation, including "State laws and regulations respecting the rates, or respecting the financial or organizational

7

regulation, of electric utilities." 16 U.S.C. § 824a-3(e); see also Wheelabrator Lisbon, Inc. v. Conn. Dept. of Pub. Util. Ctr., 531 F.3d 183, 185 n.7 (2d Cir. 2008). FERC regulations accordingly provide, that any QF is "exempted . . . from State laws or regulations respecting: (i) The rates of electric utilities; and (ii) The financial and organizational regulation of electric utilities." 18 C.F.R. § 292.602(c). The exemption "is referred to as the 'exempt[ion] from . . . utility-type . . . regulation.'" Wheelabrator, 531 F.3d at 185 n.7 (quoting Freehold Cogeneration Assocs., L.P. v. Bd. of Reg. Comm'rs of N.J., 44 F.3d 1178, 1185 (3d Cir. 1995)).

    In Freehold, the Third Circuit concluded that a state regulatory agency had impermissibly modified an EEPA by ordering the QF and utility to renegotiate the agreement's purchase rate terms. 44 F.3d at 1190. The court observed that PURPA reserves for FERC, not state regulators, the responsibility of regulating the rates at which electricity is purchased under EEPAs. Id. at 1191. PURPA gives state regulatory agencies the authority to review and approve EEPAs with a QF as a party, but once an EEPA is approved, modification of the EEPA or revocation of the approval of an EEPA constitutes "utility-type" regulation of the QF, in violation of § 210(e). Id. at 1191-92.

B. Ownership of RECs for Electricity Sold Under Preexisting EEPAs

          Previous disputes have arisen regarding whether the
generator or the electric utility should own the RECs associated
with EEPAs that predate the relevant state portfolio act.  In 2003,
FERC issued a decision declaring that REC ownership in the context
of preexisting PURPA EEPAs is a matter to be decided by the states
under state law.  American Ref-Fuel Co., 105 F.E.R.C. ¶ 61,004
(2003).  In American Ref-Fuel, FERC considered a petition from
owners of several QFs seeking a declaratory judgment that PURPA
EEPAs compensate QFs only for energy and capacity, not for any
"environmental attributes," and therefore should not "inherently
convey to the purchasing utility any renewable energy credits."
105 F.E.R.C. ¶ 61,005, at ¶ 2.  FERC granted the petition to the
extent that it sought a declaration that FERC's "avoided cost
regulations did not contemplate the existence of RECs and that the
avoided cost rates for capacity and energy sold under contracts
entered into pursuant to PURPA do not convey the RECs, in the
absence of an express contractual provision."  Id. ¶ 61,006, at ¶
18.  FERC concluded that "[w]hile a state may decide that a sale of
power at wholesale automatically transfers ownership of the state-
created RECs, that requirement must find its authority in state
law, not PURPA."  Id. ¶ 61,007, at ¶ 24.

The Second Circuit considered the issue in <u>Wheelabrator Lisbon</u>.  531 F.3d at 190.  There, the plaintiff, a QF, had challenged a ruling by the Connecticut Department of Public Utility Control ("DPUC") that the parties' EEPA "conveyed to [the utility, Connecticut Light and Power,] any RECs arising from" the production of its subject electricity.  <u>Id.</u> at 187.  The plaintiff argued that DPUC's ruling "modified the terms of the [EEPA] and thereby imposed utility-type regulation in conflict with Section 210(e) of [PURPA]."  <u>Id.</u> at 185.

The Second Circuit agreed with the district court that DPUC's interpretation of the EEPA with respect to ownership of RECs did not constitute a modification of the EEPA:

> As the District Court explained, "the DPUC decisions are unlike the [state agency] order that was the subject of <u>Freehold</u>."  Unlike the New Jersey agency in <u>Freehold</u>, "the DPUC has not ordered the [qualifying facility] to renegotiate the contract purchase price or ordered lower rates.  Rather, the DPUC considered the [energy purchase agreement] at issue and concluded that [it] transferred the renewable energy and the associated GIS Certificates to CL & P."  We agree that the DPUC did not order the renegotiation of the terms of the Agreement but simply exercised its authority to interpret the Agreement's provisions -- as it happens, in a manner that was unfavorable to Wheelabrator.  We hold, therefore, that the 2004 DPUC Decision does not modify the terms of the Agreement and, accordingly, does not violate Section 210(e) of PURPA.

<u>Id.</u> at 188-89.

The Second Circuit also found that FERC's decision in
American Ref-Fuel did not preempt DPUC's decision.  The plaintiff
had argued that American Ref-Fuel required "RECs to be sold through
express contractual provisions and that, in the absence of such a
provision, an electricity purchase agreement cannot convey RECs."
Id. at 189.  The court disagreed, again adopting the lower court's
reasoning:

> We agree with the District Court, and with FERC, that
> American Ref-Fuel did not impose such a rule.  As the
> District Court correctly observed:
>
> > [In American Ref-Fuel,] [t]he FERC concluded that
> > RECs are created by the State and controlled by
> > state law, not PURPA, and that they may be decoupled
> > from the renewable energy . . . .  Taken as a whole,
> > however, American Ref-Fuel does not stand for the
> > proposition that PURPA requires an express
> > contractual provision in order for RECs . . . to be
> > transferred to a public utility pursuant to a PURPA
> > contract . . . .  In its order denying rehearing,
> > the FERC noted that the reference to an "express
> > contractual provision" seems to have been
> > misunderstood.  The FERC elaborated: "We did not
> > mean to suggest that the parties to a PURPA
> > contract, by contract, could undo the requirements
> > of State law in this regard.  All we intended by
> > this language was to indicate that a PURPA contract
> > did not inherently convey any RECs, and
> > correspondingly that, assuming State law did not
> > provide to the contrary, the [qualifying facility]
> > by contract could separately convey the RECs."
>
> In sum, the FERC decision in American Ref-Fuel does not
> evince an intent to occupy the relevant field -- namely,
> the regulation of renewable energy credits.  Rather, it
> explicitly acknowledges that state law governs the
> conveyance of RECs.  We conclude, therefore, that the
> American Ref-Fuel does not preempt the 2004 DPUC
> Decision.

Id. at 189-90 (internal citations omitted).

11

New Jersey and Pennsylvania state courts have also considered the issue and concluded that state regulatory authorities did not run afoul of PURPA by decreeing ownership of RECs to utilities absent a contrary contractual provision.  See ARIPPA v. Pa Pub. Util. Comm'n, 966 A.2d 1204, 1209 (Pa. Commw. Ct. 2009); In re Ownership of Renewable Energy Certificates ("Ownership of RECs"), 913 A.2d 825, 828, 830 (N.J. Super. Ct. App. Div. 2007). In Ownership of RECs, a New Jersey state court found that certain language in American Ref-Fuel "might be construed as helpful to appellants," who were QFs, but that "the balance" of that opinion supported the regulator's decision that the RECs belonged to the utility.  913 A.2d at 831.  It concluded that "according to FERC, states decide who owns the REC in the initial instance."  Id.  In ARIPPA, a Pennsylvania state court similarly found that the Pennsylvania Public Utility Commission "has not modified the terms of an existing and approved contract, but rather has determined ownership of assets which were not contemplated, let alone provided for in the contracts at issue."  966 A.2d at 1209.


C. Factual and Procedural Background

        Plaintiff MEA owns and operates a 60.8 MW cogeneration facility in Morgantown, West Virginia (the "Morgantown facility") that utilizes circulated fluidized bed combustion technology to

12

burn bituminous coal refuse as its primary energy source.  Compl.
¶ 7.  As earlier noted, it is a qualified facility under PURPA.
Id. ¶ 15.  On March 1, 1989, MEA and Mon Power entered into a long-
term EEPA, whereby Mon Power has purchased the energy and capacity
generated by MEA.  Id. ¶ 19.[4]  The EEPA is in effect until 2027.
Comm'n Order 48.


          In 2006, MEA registered its Morgantown facility as an
alternative energy resource under the Pennsylvania Portfolio Act
("the Pa. Portfolio Act").  Compl. ¶ 32; 73 P.S. §§ 1648.1-1648.8.
The Pa. Portfolio Act was enacted in 2005, and like the later W.Va.
Portfolio Act, it requires electric utilities to create or purchase
alternative[5] energy credits ("Pa.-RECs") if they sell energy to
retail customers in Pennsylvania.  73 P.S. § 1648.3(a)(1).  Any
energy generated from alternative sources within the service

---

[4] While Mon Power executed the EEPA, "the Commission now regulates
the combined West Virginia operations of Mon Power and [Potomac
Edison] as a single entity, including the combined costs and
rates."  City of New Martinsville v. Pub. Serv. Comm'n of W. Va.,
729 S.E.2d 188 n.6 (W. Va. 2012), consolidated on appeal with
Morgantown Energy Associates v. Pub. Serv. Comm'n of W. Va., No.
11-1739, [hereinafter New Martinsville/MEA].

[5] Though an energy source under the West Virginia law may be
"renewable," "alternative," or neither, under the Pennsylvania law
a source may only be "alternative" or not.  73 P.S. § 1648.3.  The
"alternative" category does not include the same types of energy
sources in each state.  For instance, some sources considered
"renewable" under the West Virginia law, like solar plants, are
"alternative" under the Pennsylvania law.  W. Va. Code § 24-2F-3
(13)(A); 73 P.S. § 1648.3(b).  For simplicity and uniformity, the
court refers to credits under the Pennsylvania law as Pa.-RECs.

territory of PJM Interconnection, LLC ("PJM"), a FERC-regulated,
interstate regional transmission organization, or its successor, is
eligible to meet the requirements of the Pa. Portfolio Act. 73 P.S.
§ 1648.4.  The Morgantown facility is within the PJM service
territory and began generating Pa.-RECs in 2006.  Compl. 25, 28.
Under the Pa. Portfolio Act, MEA asserts that it owns the Pa.-RECs.
See 73 P.S. § 1648.3(e)(12) (providing that unless a contract for
electricity "explicitly assigns alternative energy credits in a
different manner, the owner of the alternative energy system . . .
owns any and all alternative energy credits associated with or
created by the production of the electric energy by such
facility").[6]  MEA has "banked" the Pa.-RECS with PJM's subsidiary,
PJM-Environmental Information Services, Inc. ("PJM-EIS") and has
also "engaged in transactions . . . in which it has sold its Pa-
RECs to electric utilities."  Compl. ¶¶ 25, 32-33.  MEA has not
alleged whether it sells any electric energy or RECs to entities
located in Pennsylvania.

        MEA's Morgantown facility also qualifies as an
alternative energy resource under the W.Va. Portfolio Act.  Id.
¶ 41.  MEA, however, has not filed and currently has not made a
determination to file an application to become certified under the

---

[6] The Pennsylvania legislature amended the Pa. Portfolio Act in
2007 to include this provision, which did not apply in ARIPPA.
ARIPPA, 966 A.2d at 1207.

W.Va. Portfolio Act to generate West Virginia credits.  Id. ¶ 41.
It asserts that it has no legal obligation to pursue certification,
and it points out that although a facility may be capable of
generating credits recognized by two different states, the credits
can be transferred only once to a utility.  Id. ¶¶ 27, 41.  As
stated above, MEA alleges that it has "engaged in transactions"
involving such transfers.  Id. ¶ 33.

        The EEPA between Mon Power and MEA, predating both
states' portfolio acts, is silent regarding ownership of any
potential RECs generated by the Morgantown facility.  Id. ¶ 42.

        1. The Commission Order

        On February 23, 2011, the Utilities filed a petition for
declaratory relief with the Commission, requesting a ruling that
the Utilities were entitled to W.Va. Portfolio Act RECs
attributable to three non-utility QFs: (1) MEA's Morgantown
facility, (2) a facility of the City of New Martinsville, (3) and
the Grant Town Project.[7]  Id. ¶ 44 & n.2.  On April 19, the
Commission named MEA as a respondent in the case.

---

[7] The second of these facilities is the subject of concurrent
litigation pending before this court as City of New Martinsville v.
Public Service Commission of West Virginia, No. 2:12-cv-1809.  The
owner of the other project, the Grant Town Project, was not a party
to the proceedings before the Commission.  Compl. ¶ 39 n. 9.

On November 22, 2011, the Commission issued an order (the "Commission Order") resolving the following two issues in the affirmative:

> 1.  Whether, under EEPAs that predate the Portfolio Act and Commission <u>Portfolio Standard Rules</u> and that are silent on the issue of credit ownership, [the Utilities] or the QFs own the credits associated with QF generation; and,
>
> 2.  If the utilities own and are entitled to credits from the facilities, whether the Commission has the jurisdiction and authority to order a QF to certify the facilities or to deem the facilities certified to generate credits under the <u>Portfolio Standard Rules</u> . . . .

Comm'n Order 10.

At the outset, the Commission noted that the Utilities estimate the cost of "acquir[ing] additional compliance credits to replace" the credits generated by MEA and the other two facilities to be "approximately $50 million through 2025." <u>Id.</u>  The Commission later refers to this as a "conservative cost estimate." <u>Id.</u> at 32.

The Commission determined that the Utilities own the credits based on "three separate but interrelated bases":

> (i) consistent with the [Portfolio] Act, the utility that is obligated to purchase PURPA generation (which also qualifies as eligible generation under the Portfolio Act) should own the credits that exist for the purpose of measuring utility compliance with the portfolio standard,

16

(ii) [the Utilities'] ownership of the credits is based
on their ownership of the qualifying energy as it is
generated, and (iii) under the circumstances of the case
in which the Portfolio Act and the EEPAs do not contain
provisions that specify credit ownership by the utility
or the QF, it is appropriate to consider equity and
fairness and the impact of our decision on utility rates
in determining credit ownership under the EEPAs based on
the provisions of W.Va. Code § 24-2F-1 et seq. that
require that the costs associated with the [Portfolio]
Act are reasonable and the provisions of Chapter 24 of
the West Virginia Code that require the Commission to
ensure fair and reasonable rates and to balance the
interests of the current and future utility customers,
the utilities and the state economy.

Id. at 43.


        The Commission concluded that:


It would be unreasonable to require the utility to purchase,
and ratepayers to pay the additional cost of credits, to
verify the purchases of PURPA generation that the utility has
purchased and will continue to purchase which qualifies as
eligible generation under the Portfolio Act.

[] In the absence of an express statutory provision governing
the issue of credit ownership under PURPA EEPAs that predate
the Portfolio Act and that are silent on the issue of credit[]
ownership, the credits under the PURPA EEPAs are owned by the
electric utility, Mon Power and PE, not the QFs, consistent
with the intent and mandates of the Act and principles of
equity and fairness.

Id. at 55.


        The Commission expressly disavowed any reliance on

federal law: "The Commission is not modifying the existing PURPA

Agreements or exercising utility-type jurisdiction over MEA; we are

determining the ownership of the credits in light of state law."

Id. at 37.  It made the following conclusions respecting the EEPAs:

17

17.  When the three EEPAs in question were negotiated and
approved by the Commission, the statutory created credits
did not exist and the retention of the credits was not a
part of the contract and agreement between the parties.
The PURPA facilities received what they bargained for,
and all that they were entitled to, when agreements were
finalized setting forth the avoided cost rates and terms
that would apply to the final EEPAs.

18.  By the very nature of the PURPA EEPAs, no additional
consideration is contemplated or needed other than the
substantial consideration that the projects received and
that is not usually available to merchant power
generators.

Id. at 54.


Respecting certification of the Morgantown facility, the

Commission observed that "allowing qualifying credits that are

owned by the [Utilities] to not be certified would work a hardship

on ratepayers." Id. at 42.  It took note of the "unusual

difficulty" the Utilities would encounter should they "seek or

expect cooperation from MEA in obtaining certification" of the

Morgantown facility.  Id.  Consequently, the Commission concluded

that, "it would be reasonable to allow the [Utilities] to seek

certification of the credits we have determined they own." Id.


The Commission again found its authority for the decision

in state law:

[T]he Commission has jurisdiction and authority over the
Morgantown project to deem the facility certified to
generate credits under the Commission Portfolio Standard
Rules based on the jurisdiction and authority provided in
the Portfolio Act and in Chapter 24 of the West Virginia

18

> Code to resolve the issues of credit ownership and to
> enable [the Utilities] to meet the compliance
> requirements of the [Portfolio] Act based on our decision
> in this case.  The Commission's assertion of jurisdiction
> to resolve the dispute over credit ownership does not
> conflict with federal jurisdiction over PURPA and the
> PURPA facilities.  As FERC determined in American Ref-
> Fuel, the states have jurisdiction to resolve the issues
> of credit ownership arising under the PURPA contracts.
> . . .  We believe that because our decision to certify
> the Morgantown facility is an extension of the
> Commission's jurisdiction over public utilities, the
> portfolio standard and credit trading system established
> by the Portfolio Act, our Order does not violate the
> PURPA's prohibition against "utility-type" state law
> regulation.

Id. at 42-43.

Generally, the Commission, in its order, discusses "the credits," without limitation on when the credits were generated and without distinction between RECs created under West Virginia law or RECs created under Pennsylvania law.  However, the Commission did offer the following:

> The Commission clarifies that [the Utilities are] entitled to
> the credits for the duration of the term of the EEPAs.
> Credits are based on energy generated by qualified facilities
> and double counting of credits is prohibited.  Because we are
> holding that [the Utilities] own the credits related to the
> power they purchase from the PURPA facilities for the
> remaining term of the EEPAs, credits that are based on the
> energy output of the QFs and that could be obtained under
> other state laws are necessarily under the control of [the
> Utilities].

Id. at 34.  In addition, the Commission ordered "that credits related to the electricity generated from . . . the Morgantown project owned by Morgantown Energy Associates; and sold pursuant to the electric energy purchase agreements discussed herein belong to

19

the purchaser," and also ordered that the "[Utilities] take reasonable steps to secure the credits from the Morgantown facility that are currently in the MEA [] account, including, but not limited to, contacting PJM-EIS to advise it of the ruling in this case." Id. at 56.

In December 2011, MEA and the City of New Martinsville filed appeals of the Commission Order with the West Virginia Supreme Court of Appeals, which the high court subsequently consolidated.  Compl. ¶ 53.

2. The April FERC Order

On February 24, 2012, while the state appeal was pending, MEA petitioned FERC to bring an enforcement action against the Commission to require compliance with PURPA.  Compl. ¶ 54.  The petition asserted that the Commission's order violates PURPA in three respects: (1) by concluding that Mon Power's payments under the EEPA warranted giving Mon Power the credits, (2) by concluding that the Commission has the authority to deem MEA's facility certified under the W.Va. Portfolio Act, and (3) by discriminating against MEA based on its QF status under PURPA in setting electricity rates, in violation of 16 U.S.C. §824a-3(b)(2) and 18 C.F.R. § 292.304(a)(1), because the Commission purportedly does not also deem RECs generated by a facility that is not qualified under

PURPA to be owned by the utility to which the facility sells power. Id. ¶ 55.

On April 24, 2012, FERC issued a Notice of Intent Not to Act and Declaratory Order.  FERC declined to exercise its discretionary enforcement authority under § 210(h) of PURPA. Morgantown Energy Associates (Morgantown I), 139 F.E.R.C. ¶ 61,066, at ¶ 44-45 (2012).  It quoted from and reiterated its holding in American Ref-Fuel:

> [FERC] has recognized that PURPA does not address the ownership of RECs and that states have the authority to determine ownership of RECs in the initial instance, as well as how they are transferred from one entity to another.

Id. ¶ 46.  It further explained the rationale behind American Ref-Fuel, stating that the rates at which the utilities must purchase power from QFs "must be just and reasonable to the electric customer of the public utility and in the public interest," but an electric utility is not required to pay the QF more than the avoided cost.  Id. ¶ 47.

Nonetheless, FERC found that "certain statements in the [Commission] Order are inconsistent with PURPA." Id. ¶ 45.  FERC concluded that "[t]o the extent that the [Commission] Order finds that avoided-cost rates under PURPA also compensate for RECs, the

[Commission] Order is inconsistent with PURPA." Id. ¶ 47.  In a footnote, FERC further explains the perceived inconsistency:

> The West Virginia Order relies primarily on the avoided cost rate in the contract[] between Morgantown Energy and Monongahela Power . . . as justification for finding that the RECs produced by the QFs are owned by the purchasing utility in the first instance.  See, e.g., West Virginia Order at 28-31.  For example, the West Virginia Order states that avoided cost rate contracts under PURPA provide a substantial consideration to the QF sufficient to compensate not only for the energy and capacity contemplated in the contracts, but also for the RECs produced by the QFs.  See West Virginia Order at 28.

Id. ¶ 47 n.68.


### 3. The Appeal to the West Virginia Supreme Court

On June 11, 2012, in New Martinsville/MEA, 729 S.E.2d 188 (W. Va. 2012), the West Virginia Supreme Court of Appeals affirmed the Commission Order in full.  The court held,

> [T]he Commission has not modified the terms of the existing EEPAs but, instead, has only determined ownership of assets -- the credits -- which were not contemplated and, thus, not provided for in the EEPAs.

Id. at 196.  It further explained,

> [T]he Commission considered the EEPAs and concluded that because the Utilities own the electricity as it is generated, they also own the credits which only come into existence after the electricity is generated.
>
> *  *  *
>
> Thus, in reaching its decision, the Commission has only interpreted the EEPAs to evaluate the Utilities' obligations under them and their ownership of the electricity at the time it is generated.  The Commission

has not interfered with the Generators' federally granted
right to be exempt from certain utility-type state
regulation.

Id. 196-97.

        The court found that the April FERC order "ha[d] no
bearing upon" the appeal before it.  Id. at 199 n.15.
Consequently, the court disagreed with FERC's concerns and
"concluded that the Commission's decision is not inconsistent with
PURPA but, rather, is a well-reasoned decision based upon our state
law."  Id.

        The court next addressed MEA's contention that the
Commission violated MEA's federal exemption from "utility-type"
state law regulation by deeming MEA certified to create West
Virginia RECs.  The court found that the Commission has an
appropriate state law basis for its determination:

> Given MEA's refusal to seek certification of its
> Morgantown project under the Portfolio Standard Rules,
> the Commission's decision to deem the project certified
> is the only mechanism by which the Utilities can receive
> certification that the energy they are purchasing
> satisfies the requirements of the Portfolio Act.  The
> Portfolio Standard Rules provide for waiver thereof upon
> a showing of hardship or unusual difficulty in complying
> with any one rule.  150 C.S.R. § 34-1.5a.  Certainly, a
> hardship on ratepayers would occur in this instance if
> the qualifying credits owned by the Utilities were not
> certified.

Id. at 200.

Given this state-law justification for certifying MEA to generate RECs, the high court then explained why it did not consider the certification to be "utility-type" regulation:

> Contrary to the assertions of MEA, the Commission's decision that it will certify the Morgantown project to create credits under the Portfolio Act . . . does not constitute impermissible "utility-type" regulation prohibited by PURPA.  The Commission's decision is simply an extension of its jurisdiction over public utilities and the authority conferred upon it by the Portfolio Act. By deeming the Morgantown project certified, the Commission is not regulating the Morgantown project in any respect; instead, it is only providing a mechanism for the owner of the energy, the Utilities, to receive certification that the energy they are purchasing qualifies for the purpose of satisfying the requirements of the Portfolio Act.

Id.

### 4. The September FERC Order

On May 6, 2012, the Utilities filed with FERC a request for clarification or, alternatively, a motion for rehearing of FERC's April Order.  Morgantown Energy Associates (Morgantown II), 140 F.E.R.C. ¶ 61,223, at ¶ 3 (2012).  The Utilities claimed that the order did not identify which statements in the Commission order were inconsistent with PURPA, and that FERC erred in determining that the Commission Order found that avoided cost rates compensate the QF for both RECs and energy.  Id.  On September 20, 2012, FERC issued an order denying request by the Utilities for reconsideration of its April order.  Id. ¶ 1.  FERC acknowledged

24

the Supreme Court of Appeals affirmance, but did not comment on its substance, instead focusing on the Commission Order.  Id. ¶ 14 & n.34.  In the September order FERC explained its concerns regarding one of the perceived rationales for the Commission's decision:

> While the [Commission] Order may also identify other bases for its decision to find that RECs produced by QFs belong to the purchasing utility, we cannot ignore those portions of the [Commission] Order that clearly refer to the avoided cost rate under PURPA as justification for its finding that RECs produced by QFs belong to the purchasing utility in the first instance.  It is likewise significant, we find, that the West Virginia Commission implied that RECs produced by non-QFs could be considered to be owned by the non-QF generator in the first instance rather than the first purchaser of the output of the non-QF generator.  The only reasonable reading of the [Commission] Order is that the West Virginia Commission's finding that the RECs produced by QFs, as opposed to RECs produced by non-QFs, are owned by the purchasing utilities in the first instance is based on the West Virgnia Commission's belief that the PURPA avoided cost rates are overly generous and therefore must include RECs.

Id. ¶ 21.  It continued,

> We note . . . that the West Virginia Commission did not find the sale of power at wholesale automatically transfers RECs.  Instead, the West Virginia Commission found that RECs produced by QFs are owned by the purchasing utility (while RECs produced by non-QFs are not); and the West Virginia Commission clearly based this finding on its expressly stated belief that avoided cost rates were overly generous to utilities and unfair to consumers.  Under these circumstances it is clear that to this extent, at least, the West Virginia Order is inconsistent with the Commission's ruling in American Ref-Fuel that avoided cost rates "in short, are not intended to compensate the QF for more than capacity and energy."

Id. (quoting Am. Ref-Fuel, 105 F.E.R.C. ¶ 61,004, at ¶ 22).

The order then makes clear that FERC's criticism is limited to the rationale perceived by it in the Commission Order, not the Commission's actual decision to assign credits to the utilities:

> Because the ownership of the RECs is a matter of West Virginia law, we are not dictating to West Virginia whether a generator or the electric utility purchasing capacity and energy from the generator should own RECs at their creation.  Rather, we merely find that the West Virginia Commission cannot, consistent with PURPA, assign ownership of the RECs to the Utilities on the grounds that the avoided cost rates in their PURPA [agreements] compensate the QFs for RECs in addition to energy and capacity.

Id. ¶ 24.  In addition, FERC acknowledged that the Commission Order rested on other justifications as well: (1) that "it is unreasonable to retroactively apply [the unbundling provision, Portfolio Standard Rule 5.6] to PURPA [EEPAs] entered into prior to the rule's effective date," and (2) that "because RECs are a tool for ensuring that electric utilities purchase energy that satisfies their renewable portfolio standard obligations, RECs are not necessary in the presence of PURPA [EEPAs] because PURPA [EEPAs] perform the same function as RECs."  Id. ¶ 21 n. 45.  Ultimately, FERC denied the request, rejecting the Utilities' arguments for reconsideration.  Id. ¶ 26.

### 5. Federal District Court

Under PURPA, when FERC declines to bring an enforcement action within 60 days of the filing of a petition, the petitioner may bring its own enforcement action against the state regulatory authority in the appropriate U.S. district court.  16 U.S.C. § 824a-3(h)(2)(B).  Pursuant to that provision, MEA filed the present action on October 8, 2012.

The complaint names as defendants the Commission and its individual commissioners.  It asserts six counts.  Count I seeks a declaratory judgment that the Commission Order violates PURPA and its implementing regulations.  Count II claims that the Commission Order is preempted because it has the effect of modifying the avoided cost in the EEP agreement, a power reserved solely to FERC under PURPA.  Count III seeks a declaration that the Commission Order violates PURPA's exemption of QFs from state utility-type regulation.  Count IV seeks a declaration that the Commission Order violates PURPA § 210(b) by discriminating against QFs.  Count V seeks an order enjoining the Commission from enforcing the Commission Order.  Lastly, Count VI alleges that the individual commissioners violated the Takings Clause of the Fifth Amendment by granting ownership of MEA's Pa.-RECs to the Utilities without just compensation.

The original defendants, consisting of the Commission and its commissioners, filed their pending motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on December 7, 2012.  On January 10, 2013, the court granted the Utilities' motion to intervene as party defendants, and on January 25, 2013 the Utilities filed their pending motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

In their motions, the defendants assert that federal jurisdiction is barred by the Rooker-Feldman doctrine.  They also contend that this action is not properly before this court because it is not a challenge to the Commission's "implementation" of PURPA, but rather an "as applied" challenge.  The Utilities additionally argue that the court should abstain from adjudicating the controversy under various abstention doctrines.

Should the court recognize jurisdiction and decline to abstain, the defendants maintain that preclusion principles require it to honor the state decisions granting credit ownership to the electric utilities.  The Utilities also argue that each Counts I-V of the complaint should be dismissed for failure to state a claim, and the Commission argues that Count VI should be dismissed for failure to state a claim.

## II. Governing Standard

Under Federal Rule of Civil Procedure 8(a)(1), a complaint must contain "a short and plain statement of the grounds for the court's jurisdiction." Rule 12(b)(1) correspondingly permits a defendant to assert, by motion, that the plaintiff's claim for relief fails for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). The plaintiff has the burden of proving that subject matter jurisdiction exists. Evans v. B.F. Perkins, Co., 166 F.3d 642, 647 (4th Cir. 1999). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" Id. (quoting Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). The court "should grant the Rule 12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" Id. (quoting Richmond, 945 F.2d at 768).

Under Rule 8(a)(2), the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) correspondingly permits a

defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).  Facial plausibility exists when the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The plausibility standard "is not akin to a 'probability requirement,'" but it requires more than a "sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

In assessing plausibility, the court must accept as true the factual allegations contained in the complaint, but not the legal conclusions.  Id.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." Id. The determination is "context-specific" and requires "the reviewing court to draw on its judicial experience and common sense." Id. at 679.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion "is assessed under the same standard that applies to a Rule 12(b)(6) motion." Walker v. Kelley, 589 F.3d 127, 139 (4th Cir. 2009); Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 154 (4th Cir. 2009) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).

III. Discussion

A. The Rooker-Feldman Doctrine

The defendants argue that the Rooker-Feldman doctrine bars this court's jurisdiction. The United States Supreme Court holds that the doctrine "recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to this Court." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 644 n.3

31

(2002).  It is named for the only two Supreme Court cases in which
it has been applied: Rooker v. Fidelity Trust Co., 263 U.S. 413
(1923), and Columbia Court of Appeals v. Feldman, 460 U.S. 462
(1983).  See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544
U.S. 280, 283 (2005).

In Exxon Mobil, the Supreme Court warned that lower
courts had at times applied the doctrine "far beyond the contours
of the Rooker and Feldman cases, overriding Congress' conferral of
federal-court jurisdiction concurrent with jurisdiction exercised
by state courts, and superseding the ordinary application of
preclusion law pursuant to 28 U.S.C. § 1738."  544 U.S. at 283.
The Court clarified that the doctrine is limited to "cases brought
by state-court losers complaining of injuries caused by state-court
judgments rendered before the district court proceedings commenced
and inviting district court review and rejection of those
judgments."  Id. at 284.

It added that the Rooker-Feldman doctrine does not become
applicable "simply because a party attempts to litigate in federal
court a matter previously litigated in state court."  Id. at 293.
The federal district court still has jurisdiction if the case
before it "'present[s] some independent claim'" even if that claim
"'denies a legal conclusion that a state court has reached in a

case to which [the plaintiff] was a party.'"  Id. (quoting GASH

Assocs. v. Rosemont, 995 F.2d 726, 728 (7th Cir. 1993)).  Thus, in

Exxon Mobil, the Court declined to apply Rooker-Feldman where the

plaintiff did not "repair[] to federal court to undo the [state

court] judgment in its favor" but rather "filed suit in Federal

District Court . . . to protect itself in the event it lost in

state court on grounds (such as the state statute of limitations)

that might not preclude relief in the federal venue."  Id. at 293-

94.


        Discussing the impact of Exxon Mobil, our court of

appeals explained,

    Whereas [before Exxon] we examined whether the state-
    court loser who files suit in federal court is attempting
    to litigate claims he either litigated or could have
    litigated before the state court, Exxon requires us to
    examine whether the state-court loser who files suit in
    federal district court seeks redress for an injury caused
    by the state-court decision itself.  If he is not
    challenging the state-court decision, the Rooker-Feldman
    doctrine does not apply.

Davani v. Virginia Department of Transportation, 434 F.3d 712, 718

(4th Cir. 2006) (footnote omitted) (permitting a federal employment

discrimination and retaliation action following the state court's

refusal to overturn the plaintiff's grievance with the employer).

It borrowed this example from the Second Circuit:

    Suppose a plaintiff sues his employer in state court for
    violating . . . anti-discrimination law and . . . loses.
    If the plaintiff then brings the same suit in federal
    court, he will be seeking a decision from the federal
    court that denies the state court's conclusion that the

employer is not liable, but he will not be alleging
injury from the state judgment.  Instead, he will be
alleging injury based on the employer's discrimination.
The fact that the state court chose not to remedy the
injury does not transform the subsequent federal suit on
the same matter into an appeal, forbidden by Rooker-
Feldman, of the state-court judgment.

Id. at 719.


        The Supreme Court further emphasized the doctrine's

limits in Lance v. Dennis, decided the term following Exxon Mobil:

    Neither Rooker nor Feldman elaborated a rationale for a
    wide-reaching bar on the jurisdiction of lower federal
    courts, and our cases since Feldman have tended to
    emphasize the narrowness of the Rooker-Feldman rule.  See
    Exxon Mobil, 544 U.S., at 292, 125 S.Ct. 1517 (Rooker-
    Feldman does not apply to parallel state and federal
    litigation); Verizon Md. Inc. v. Public Serv. Comm'n of
    Md., 535 U.S. 635, 644, n. 3, 122 S.Ct. 1753, 152 L.Ed.2d
    871 (2002) (Rooker-Feldman "has no application to
    judicial review of executive action, including
    determinations made by a state administrative agency");
    Johnson v. De Grandy, 512 U.S. 997, 1005–1006, 114 S.Ct.
    2647, 129 L.Ed.2d 775 (1994) (Rooker-Feldman does not bar
    actions by a nonparty to the earlier state suit).
    Indeed, during that period, "this Court has never applied
    Rooker-Feldman to dismiss an action for want of
    jurisdiction."  Exxon Mobil, supra, at 287, 125 S.Ct.
    1517.

546 U.S. 459, 464 (2006).  Particularly relevant to this case is

the admonition that "[t]he doctrine has no application to judicial

review of executive action, including determinations made by a

state administrative agency."  Verizon Md., 535 U.S. at 644 n.3.


                            34

The facts in Verizon Maryland were somewhat analogous to those here.  Pursuant to the Telecommunications Act of 1996, the Maryland Public Service Commission had approved an "interconnection agreement" and "reciprocal compensation arrangement" through which Verizon would share its network with WorldCom and other competitors.  Id. at 638-39.  Sometime thereafter, Verizon informed WorldCom that it would no longer pay for certain calls which it contended were not subject to the interconnection agreement.  Id. WorldCom filed a complaint with the commission challenging Verizon's claim, and the commission found in favor of WorldCom. Id.  On appeal, a Maryland state court affirmed the order.  Id.

Verizon then filed an action in federal district court, alleging that the commission's ruling violated the 1996 Act and a later FCC determination.  Id. at 640.  The district court dismissed the action, and the Fourth Circuit affirmed on immunity grounds. Id.  On appeal to the Supreme Court, the commission suggested that Rooker-Feldman should have precluded federal jurisdiction.  The Court dismissed the argument in a footnote, stating that Rooker-Feldman limits jurisdiction "over state-court judgments" and therefore does not apply "to judicial review of executive action, including determinations made by a state administrative agency." Id. at 644 n.3.

This court finds the Rooker-Feldman doctrine likewise inapplicable to MEA's claims. MEA has not brought a direct challenge to the West Virginia Supreme Court's judgment. MEA is challenging the Commission's ruling regarding credit ownership, a determination by a state administrative agency, just as in Verizon Maryland. While the federal challenge may "deny" the West Virginia Supreme Court's legal conclusion that the Commission Order is consistent with PURPA, that denial does not make this action a challenge to a state court judgment. See Exxon Mobil Corp., 544 U.S. at 293. The Commission's further argument that the state high court created the injury by making the Commission order the "law of the land in West Virginia" is unpersuasive. Comm'n's Mem. Supp. Mot. Dismiss 18. Such a rationale would apply to any state high court decision and considerably broaden a doctrine whose application the Supreme Court has expressly left rather narrow.

Having found that this case is not a direct challenge to a state court judgment, the court need not address MEA's two alternative arguments against the application of Rooker-Feldman: 1) that this action began with the FERC petition and therefore preceded the state court judgment and 2) that the doctrine is inapplicable because this court has exclusive jurisdiction over PURPA implementation challenges.

B. Statutory Jurisdiction Under PURPA

The defendants also assert that this case does not challenge the Commission's "implementation" of FERC rules for electric utilities, and consequently fails to qualify for PURPA's statutory grant of jurisdiction to federal district courts. <u>See</u> PURPA § 210(f, h), 16 U.S.C. § 824a-3(f, h).

Section 210 of PURPA provides the mechanism though which qualifying facilities can bring an action in federal district court. As discussed above, § 210(f) concerns the "[i]mplementation of rules for qualifying cogeneration and qualifying small power production facilities" and requires "each State regulatory authority" -- in this case, the Commission -- to "implement such rule (or revised rule) for each electric utility for which it has ratemaking authority." <u>Id.</u> The implementation must occur "on or before the date one year after" FERC prescribed the rule. <u>Id.</u> If the regulatory authority fails to implement the FERC rules, § 210(h) provides that "[a]ny electric utility, qualifying cogenerator, or qualifying small power producer may petition [FERC] to enforce the requirements of subsection (f)." <u>Id.</u> § 824a-3(h)(2)(B). If FERC declines to bring an enforcement action, § 210(h) then authorizes the electric utility, qualifying cogenerator, or qualifying small power producer to bring an action

against the state regulatory authority in "the appropriate United States district court."  Id.

MEA's complaint expressly provides § 210(h) as the basis for this court's jurisdiction for claims against the Commission arising under PURPA.  Compl. ¶ 5.  The defendants, however, contend that this lawsuit does not relate to the Commission's "implementation" of FERC rules because the initial assignment of RECs is controlled by state law, not by PURPA.  They consequently assert that this court lacks jurisdiction under § 210(h) to review the Commission Order.

The court believes its exercise of jurisdiction is proper in this instance.  While Wheelabrator and American Ref-Fuel conclude that state regulatory agencies' assignment of RECs is a matter of state law, these opinions do not stand for the further position that the assignment of state credits can never result in a violation of PURPA.  Consistent with those opinions, a state commission would violate PURPA by assigning credits in a way that directly modifies EEPAs, that is, by ruling that the EEPAs "inherently convey" the credits.  Am. Ref-Fuel, 105 F.E.R.C. ¶ 61,005.  That is what MEA alleges has happened in this case.

38

FERC, in somewhat qualified language, appears to agree with MEA, and though it declined to initiate an enforcement action, FERC expressly stated that MEA "may bring its own enforcement action . . . in the appropriate United States district court." 139 F.E.R.C. ¶ 61,066 at ¶ 45. The defendants argue that the court is not obligated to follow a FERC order. See Xcel Energy Servs., Inc. v. FERC, 407 F.3d 1242, 1244 (D.D.C. 2005) ("An order that does no more than announce [FERC's] interpretation of the PURPA or one of the agency's implementing regulations is of no legal moment unless and until a district court adopts that interpretation when called upon to enforce the PURPA."). While that may be, close scrutiny of FERC's conclusions is inappropriate in the context of a jurisdictional inquiry, and the court, accordingly, takes FERC's conclusions at face value as support for jurisdiction. See Hartley v. CSX Transp., Inc., 187 F.3d 422, 425 (4th Cir. 1999) ("[A] jurisdictional inquiry is not the appropriate stage of litigation to resolve these various uncertain questions of law and fact. . . . To permit extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules.").

Section 210 gives this court jurisdiction over challenges to PURPA implementation, and this is such a challenge. Whether it is also a fruitful challenge should not be determined within the

threshold jurisdictional inquiry.  The court concludes that
jurisdiction is proper and leaves consideration of American Ref-
Fuel for the discussion of MEA's specific claims.


        The court rejects the defendants' argument that the
assignment of Portfolio Act credits is not a matter of PURPA
implementation because, it says, "implementation" occurred in 1981,
when it implemented West Virginia's PURPA program.  Comm'n's Mem.
Supp. Mot. Dismiss 25.  See also Mem. Supp. Utilities' Mot. J.
Pleadings 13, 20.  A 1983 FERC policy statement clarifies that
implementation enforcement under § 210 extends to state regulatory
authorities that "completed the implementation process, but have
promulgated regulations which are inconsistent with or contrary to
[FERC's] regulations."  Policy Statement Regarding the Commission's
Enforcement Role Under Section 210 of the PURPA ("Policy
Statement"), 23 F.E.R.C. ¶ 61,304, at ¶ 61,644 (1983).  The policy
statement continues: "Thus, for example, an allegation that a State
regulatory authority had promulgated regulations which include a
purchase rate standard contrary to [FERC] regulations would
properly lie before [FERC] or before a judicial forum of proper
jurisdiction."  Id.; see also Occidental Chem. Corp. v. La. Pub.
Serv. Comm'n, 494 F. Supp. 2d 401, 409 (M. D. La. 2007) ("Federal
jurisdiction under § 210(h) exists whenever a state regulatory
authority has adopted requirements that 'include a purchase rate

40

standard contrary to existing [FERC] regulations.'" (quoting Policy
Statement, 23 F.E.R.C. at ¶ 61,644)).  Section 210 "implementation"
actions are not limited to the review of a regulatory authority's
initial implementation.  If the Commission Order modified the EEPA
purchase rates contrary to FERC regulations, as MEA alleges, then
the Commission has failed to implement PURPA.


        The court likewise disagrees with the defendants' related
contention that jurisdiction is improper because the complaint can
"[a]t best" be construed as an "as applied" challenge.  Comm'n's
Mem. Supp. Mot. Dismiss 24-25; see also Utilities' Mem. Supp. Mot.
J. Pleadings 11.  As one court explained,

> An implementation claim . . . involves a contention that
> the state agency has failed to implement a lawful
> implementation plan under § 210(f) of PURPA.  An as-
> applied claim, in contrast, involves a contention that
> the agency's implementation plan is unlawful, as it
> applies to or affects an individual petitioner.

Mass. Inst. of Tech. v. Mass. Dep't of Pub. Util. ("MIT"), 941 F.
Supp. 233, 237 (D. Mass. 1996).  "Because the jurisdictional grant
in § 210(h) of PURPA extends only to cases in which a federal court
is asked to require a state agency . . . to implement, federal
courts have refused to hear as-applied claims."  Id. (citing
Greensboro Lumber Co. v. Ga. Power Co., 643 F.Supp. 1345, 1374
(N.D. Ga. 1986), aff'd 844 F.2d 1538, 1542 (11th Cir. 1988) ("The
district court held that it lacked subject matter jurisdiction over

Greensboro's 'as applied' claim, and we find its reasoning persuasive.")).

In arguing that the pending action is an "as applied" challenge, the defendants rely on Greensboro Lumber and MIT. The court observes that the instant case differs from those "as applied" cases in that the complaint alleges an impermissible modification of preexisting EEPAs that would broadly affect all West Virginia QFs. In Occidental Chemical Corp., the district court distinguished Greensboro Lumber and MIT on grounds that are equally apt in this case. See 494 F. Supp. 2d at 410 ("Inasmuch as the Greensboro Lumber Co. court relied upon the allegation that the non-regulated utility violated PURPA as-applied to the plaintiff alone, the case is distinguishable. In the case sub judice, neither Carville nor Occidental allege that the [state regulatory] order violates PURPA as-applied to either plaintiff alone."); id. ("Like Greensboro Lumber Co., Mass. Inst. of Tech. is distinguishable because neither Carville nor Occidental allege that either is the only QF subjected to the new methodology for calculating avoided cost. To the contrary, Occidental alleges that 'the [state regulator's] failure to implement PURPA is demonstrated by the broad scope of entities to whom the [state regulator's] Order applies . . . .'").[8] The Commission Order sets forth a rule

---

[8] The Commission argues that Occidental Chemical is itself

that broadly applies to PURPA QFs and that is allegedly

"inconsistent with or contrary to [FERC's] regulations." <u>Policy</u>

<u>Statement</u>, 23 F.E.R.C. at ¶ 61644.  The Commission Order does not

relate to a "particular qualifying facility,"[9] <u>Greensboro Lumber</u>,

643 F. Supp. at 1374, and the court is satisfied that this action

is not an "as applied" challenge.


C. Abstention

        The Utilities argue that this court should abstain from

adjudicating MEA's claims under the <u>Younger</u>, <u>Burford</u>, <u>Pullman</u>,

<u>Princess Lida</u>, and <u>Colorado River</u> abstention doctrines because the

"exact claims" have already been adjudicated in state proceedings

before the Commission and the West Virginia Supreme Court of

Appeals.  Utilities' Mem. Supp. Mot. J. Pleadings 3, 24-25.  The

Utilities' opening brief dedicates a mere three sentences of

argument to these several complex doctrines.  The reply brief

---

distinguishable because in that case the state regulator expressly
authorized modification of the QF's avoided cost rates, whereas
this case "indirectly reduces the QFs avoided cost rate previously
implemented." Comm'n Reply 19.  But MEA claims precisely the
contrary: that, inasmuch as the Commission relied on the avoided
cost rates as grounds for its decision, it directly modified the
rates.  Moreover, even if such a distinction is tenable, it is of
no consequence to the grounds on which <u>Occidental Chemical</u>
distinguished <u>Greensboro Lumber</u> and <u>MIT</u>.

[9] The Commission acknowledged the breadth of the Commission Order's
impact when, in arguing for the application of <u>Rooker-Feldman</u>, it
stated that the Commission Order had become the "law of the land in
West Virginia."  Comm'n's Mem. Supp. Mot. Dismiss 18.

simply gives a short discussion of Burford followed by a series of sentences, each one of which describes why a different abstention doctrine applies to this case.  The court concludes that the abstention arguments have not been seriously raised by the Utilities.  In any event, the court declines to abstain under the aforementioned doctrines.  The case has been fully resolved in the West Virginia Supreme Court of Appeals and there is no ongoing, parallel state proceeding, so abstention is not warranted under Younger, Colorado River, or Pullman.  See England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 416 n.7 (1964) (Pullman); United States v. South Carolina, 720 F.3d 518, 527 (4th Cir. 2013) (Younger); Ackerman v. ExxonMobil Corp., -- F.3d --, 2013 WL 4008699, at *3 (4th Cir. 2013) (Colorado River).  There are no unresolved questions of state law, so abstention is not warranted under Burford.  See Town of Nags Head v. Toloczko, -- F.3d --, 2013 WL 4517074 at *3 (4th Cir. 2013).  Finally, MEA does not request that the court take control of property over which a state court has obtained jurisdiction.  Rather than asking the court to control the RECs, MEA asks for an injunction against the Commission, damages, and declaratory relief.  Therefore, abstention is not warranted under Princess Lida.  See Gannett Co., Inc. v. Clark Const. Group, Inc., 286 F.3d 737, 747 n. 9 (4th Cir. 2002). [10]

---

[10] The court also declines to abstain pursuant to the discussion in the order dismissing the companion case before it, City of New Martinsville v. Public Service Comm'n of West Virginia, 2:12-cv-

D. Res Judicata and Collateral Estoppel

  The defendants assert that res judicata and collateral estoppel bar MEA's complaint because the issues have been fully litigated within the Commission's proceeding and the state court appeal.

  The Full Faith and Credit Act, 28 U.S.C. § 1738 requires the federal court to "give the same preclusive effect to a state-court judgment as another court of that State would give." Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 523 (1986).  The application of preclusion principles is subject to a two-part inquiry:

> First, a federal court must look to state law to
> determine the preclusive effect of the state court
> judgment.  If state law would not bar relitigation of an
> issue or claim decided in the earlier proceeding, then
> the inquiry ends -- a federal court will not give the
> state court judgment preclusive effect either.  If state
> law would afford the judgment preclusive effect, however,
> then a federal court must engage in a second step -— it
> must determine if Congress created an exception to
> § 1738.  Only if "some exception to § 1738 applie[s]" can
> a federal court refuse to give a judgment the preclusive
> effect to which it is entitled under state law.  An
> exception "will not be recognized unless a later statute
> contains an express or implied partial repeal" of § 1738.

---

1809.

In re Genesys Data Techs., Inc., 204 F.3d 124, 128 (4th Cir. 2000)

(citations omitted); see also Jaffe v. Accredited Sur. and Cas.

Co., 294 F.3d 584, 590 (4th Cir.2002).


     Under the relevant state law, res judicata prevents

relitigation when three elements are satisfied:

> First, there must have been a final adjudication on the
> merits in the prior action by a court having jurisdiction
> of the proceedings.  Second, the two actions must involve
> either the same parties or persons in privity with those
> same parties.  Third, the cause of action identified for
> resolution in the subsequent proceeding either must be
> identical to the cause of action determined in the prior
> action or must be such that it could have been resolved,
> had it been presented, in the prior action.

Blake v. Charleston Area Med. Ctr., Inc., 498 S.E.2d 41, 49 (W. Va.

1997) (quoting Hannah v. Beasley, 53 S.E.2d 729, 732 (W. Va.

1949)).  The West Virginia Supreme Court of Appeals has further

expounded on what constitutes the same cause of action in the res

judicata context:

> "[F]or purposes of res judicata, 'a cause of action' is
> the fact or facts which establish or give rise to a right
> of action, the existence of which affords a party a right
> to judicial relief. . . .  The test to determine if the
> . . . cause of action involved in the two suits is
> identical is to inquire whether the same evidence would
> support both actions or issues. . . .  If the two cases
> require substantially different evidence to sustain them,
> the second cannot be said to be the same cause of action
> and barred by res judicata."

Id. at 48 (quoting White v. SWCC, 262 S.E.2d 752, 756 (W. Va.

1980)).  For res judicata to be applicable, a prior adjudication

need not have formally and directly addressed a matter:

> "[A]n adjudication by a court having jurisdiction of the
> subject-matter and the parties is final and conclusive,
> not only as to the matters actually determined, but as to
> every other matter which the parties might have litigated
> as incident thereto and coming within the legitimate
> purview of the subject-matter of the action.  It is not
> essential that the matter should have been formally put
> in issue in a former suit, but it is sufficient that the
> <u>status</u> of the suit was such that the parties might have
> had the matter disposed of on its merits."

<u>Id.</u> (quoting Syl. Pt. 1, <u>Conley v. Spillers</u>, 301 S.E.2d 216, 217

(W. Va. 1983)).


For administrative agency decisions, the preclusion rule

is derived from <u>Page v. Columbia Natural Resources, Inc.</u> and

provides as follows:

> An assessment of three factors is ordinarily made in
> determining whether res judicata and collateral estoppel
> may be applied to a hearing body: (1) whether the body
> acts in a judicial capacity; (2) whether the parties were
> afforded a full and fair opportunity to litigate the
> matters in dispute; and (3) whether applying the
> doctrines is consistent with the express or implied
> policy in the legislation which created the body.

480 S.E.2d 817, 831 (W. Va.) (quoting Syl. Pt. 3, <u>Mellon-Stuart Co.

v. Hall</u>, 359 S.E.2d 124, 126 (W. Va. 1987)).


One need not pause to consider whether the proceedings

that culminated in the Commission Order met this test.  According

preclusive effect to the Commission Order would be inconsistent

with the framework through which the court conducts its review,

inasmuch as Section 210(h) gives the court jurisdiction to review

47

regulatory authority decisions for compliance with PURPA
implementation rules.  Barring review due to the Commission's own
proceedings would significantly impair the court's ability to carry
out that congressionally granted function.

          The court, however, concludes that the Supreme Court of
Appeals' decision in New Martinsville/MEA bars relitigation of
MEA's claims.  First, New Martinsville/MEA was a final adjudication
on the merits by a court having jurisdiction of the proceedings.
Blake, 498 S.E.2d at 49.  The high court affirmed the Commission's
order as consistent with both PURPA and state law.  New
Martinsville/MEA, 729 S.E.2d at 196-97, 199 ("[W]e find no merit to
the arguments asserted by the Generators and, therefore, the
decision of the Commission finding that the credits at issue are
owned by the Utilities is affirmed.").  As expressly recognized by
FERC, the high court had jurisdiction to consider PURPA
implementation claims:

> [T]he Commission [(FERC)] believes that its jurisdiction
> to review and enforce the section 210(f) implementation
> requirement (i.e., the requirement that State regulatory
> authorities . . . promulgate rules consistent with the
> requirements established by this Commission under section
> 210(a) of PURPA) is not exclusive.  In fact, we would
> anticipate that generally proceedings would be initiated
> at the State level.

Policy Statement, 23 F.E.R.C. ¶ 61,304, at ¶ 61,664.

48

MEA's position to the contrary -- that this court has exclusive jurisdiction over PURPA enforcement claims -- is based on the following statement from a federal court of appeals:

> Congress created in § 210 a complete and independent scheme by which the purposes of PURPA are to be realized. That scheme involves the promulgation of regulations by the FERC, and their subsequent enforcement exclusively in federal district court, at the insistence of either a private party or the FERC itself.

Industrial Cogenerators v. FERC, 47 F.3d 1231, 1235-36 (D.C. Cir. 1995). MEA overlooks that the appeals court made the statement in the context of the plaintiff's direct challenge to a FERC order. Under PURPA, a plaintiff may opt to pursue judicial enforcement of a state's PURPA implementation in one of two ways: directly, at the state level under § 210(g); or in federal district court after petitioning FERC under § 210(h). See Rainbow Ranch Wind, LLC & Rainbow West Wind, LLC, 139 F.E.R.C. ¶ 61,304 ("Section 210(g) and section 210(h) of PURPA provide for separate state and federal rights to challenge a state's implementation of PURPA. A state's implementation of PURPA and the Commission's rules implementing PURPA may be challenged either through the state courts under section 210(g) of PURPA, or separately at the Commission under section 210(h) of PURPA, or both."). Industrial Cogenerators' discussion of exclusivity stands only for the proposition that a direct challenge to a FERC order must occur under § 210(h), at the federal district court. Here, MEA is challenging a state implementation enforcement action, not a FERC order.

The second element required for applying preclusion is satisfied since, in both this case and New Martinsville/MEA, MEA is challenging the Commission Order and the Commission and the Utilities are defending.  See Blake, 498 S.E.2d at 49.  While the individual Commissioners were not parties to New Martinsville/MEA, MEA does not assert that the Commissioners were not in privity with the Public Service Commission.  Indeed, the Commissioners, sued here in their official capacity, are in privity with the Public Service Commission.  While the West Virginia cases are relatively silent on the matter, there exists other persuasive authority on the issue.  See, e.g., Tait v. Western Maryland R. Co., 289 U.S. 620 (1933) (tax collector in privity with Commissioner of Internal Revenue); Mears v. Town of Oxford, Md., 762 F.2d 368, 371 n.3 (4th Cir. 1985) (applying Maryland law).

Finally, the causes of action identified for resolution in this action are identical to the causes of action determined in New Martinsville/MEA, or such that they could have been resolved, had they been presented.  See id.  The West Virginia Supreme Court of Appeals addressed and rejected MEA's Count I argument that the Commission improperly modified the EEPAs: "the Commission has not modified the terms of the existing EEPAs but, instead, has only determined ownership of assets -- the credits -- which were not

50

contemplated and, thus, not provided for in the EEPAs." <u>New Martinsville/MEA</u>, 729 S.E.2d at 196.

The same discussion also addresses MEA's Count II preemption claim, which arises from the allegedly improper modification.  Count II alleges "[s]pecifically" that the Commission was prohibited from "holding that the payment of avoided cost rates included compensation for RECs."  Compl. ¶ 72.  Notably, the high court addressed this issue.  It recognized that modifying the EEPA is something the Commission cannot do under § 210(e) of PURPA, citing <u>Freehold</u>, 44 F.3d at 1192; and it concluded that the Commission's actions were not preempted because the Commission did not modify the terms of the EEPA.  <u>New Martinsville/MEA</u>, 729 S.E.2d at 196.

<u>New Martinsville/MEA</u> directly and thoroughly resolved MEA's Count III claim that the decision to certify the Morgantown facility constituted utility-type regulation, concluding that it did not.  <u>Id.</u> at 196-97, 200.  There the court noted that "MEA argues that the Commission's conclusion that it can 'deem' the Morgantown project certified to create credits recognized by West Virginia law contradicts MEA's federally-created exemption from 'utility-type' state law regulation."  <u>Id.</u> at 199.  Here, MEA makes the same claim in Count III: "The [Commission's] decision that it

'has the jurisdiction and authority to deem' MEA's facility certified as a qualified energy resource to generate WV-RECs exerts impermissible 'financial' and 'organizational' regulation of MEA." Compl. ¶ 79.

In Count IV, MEA asserts that "[t]he [Commssion] Order violates PURPA's anti-discrimination provision by determining that the avoided cost rates paid to MEA . . . include MEA's WV-RECs." Compl. ¶ 86.  PURPA mandates that rates for the purchase of energy by a utility must not discriminate against QFs (as compared to facilities that are not qualified).  16 U.S.C. § 824a-3(b)(2).  MEA claims that under West Virginia law, a non-QF will retain any RECs associated with the energy it generates.  As a result, MEA argues, the Commission Order discriminates because QFs do not get to keep their RECs -- instead they go to the utility with which the QF has a contract.

For the moment, the court sets aside whether MEA is correct about the state of the law in West Virginia and its discriminatory effect.  The viability of MEA's cause of action is not at issue in an analysis of res judicata.  All the court need

52

determine is whether MEA asserts the same cause of action as in New Martinsville/MEA.[11]

As to whether MEA asserts the same cause of action as in New Martinsville/MEA, the discrimination argument in Count IV appears directly in MEA's brief presented before the West Virginia Supreme Court of Appeals.  Utilities' Mot. Dismiss, Exh. A 32. Therefore, even if the discrimination claim did not constitute the same cause of action as in the instant case -- which it did because there is no additional evidence required to pursue it -- it clearly could have been made in New Martinsville/MEA, inasmuch as the argument was, in fact, presented there.  That is enough for res judicata.

Count V merely requests injunctive relief, and is not a stand-alone claim.  Finally, respecting Count VI, the West Virginia Supreme Court of Appeals directly considered and rejected MEA's argument that the Commission Order "results in the taking of private property without just compensation."  New Martinsville/MEA, 729 S.E.2d at 197 n.13 ("[W]e find no merit to this argument because the Commission determined that the credits were owned by

---

[11] Nevertheless, the court does ultimately examine the merits of MEA's discrimination claim and concludes that MEA makes an incorrect statement of the law and that the Commission Order is not discriminatory.  See infra Part III.E.4, pp. 61-63.

the Utilities in the first instance.  The Commission's decision
could not constitute an unconstitutional taking because no property
owned by [MEA] was taken.").


Despite the overlap between this case and New
Martinsville/MEA, MEA insists that the two cases are entirely
distinct claims: "The object of this case -- enforcement of a PURPA
implementation claim -- is separate and distinct from the issue of
REC ownership presented in the New Martinsville case."[12]  Opp'n to
Comm'n's Mot. Dismiss 23.  As stated above, however, state law
interprets a "cause of action" for purposes of res judicata as "the
fact or facts which establish or give rise to a right of action,
the existence of which affords a party a right to judicial relief."
See Blake, 498 S.E.2d at 48.  In both New Martinsville/MEA and this
case, MEA attempts to overturn the Commission Order, and it is the
circumstances of the PURPA implementation claims and takings claim

---

[12] Even if this were the case, it appears that New
Martinsville/MEA's underlying conclusions would merit preclusive
effect on collateral estoppel grounds.  See Bland v. State, 737
S.E.2d 291, 297 (W. Va. 2012) ("Collateral estoppel will bar a
claim if four conditions are met: (1) The issue previously decided
is identical to the one presented in the action in question; (2)
there is a final adjudication on the merits of the prior action;
(3) the party against whom the doctrine is invoked was a party or
in privity with a party to a prior action; and (4) the party
against whom the doctrine is raised had a full and fair opportunity
to litigate the issue in the prior action." (quoting Syl. Pt. 1,
State v. Miller, 459 S.E.2d 114 (W. Va. 1995))).

that give rise to the right of action in each case.  Therefore, the causes of action are identical.

MEA suggests that even if the requirements for res judicata are satisfied, the court may nonetheless decline to enforce the doctrine.  MEA is right that the court is not obligated to apply the doctrine: "[E]ven though the requirements of res judicata may be satisfied, we do 'not rigidly enforce [this doctrine] where to do so would plainly defeat the ends of Justice.'"  Blake, 498 S.E.2d at 50 (quoting Gentry v. Farruggia, 53 S.E.2d 741, 742 (W. Va. 1949)).  However, it is unclear how MEA believes the West Virginia Supreme Court of Appeals' decision in New Martinsville/MEA would "plainly defeat the ends of justice," apart from the mere fact that MEA disagrees with its outcome.  Moreover, as discussed below, this court substantially agrees with New Martinsville/MEA -- although it need not agree to apply res judicata.  See Blake, 498 S.E.2d at 49 ("An erroneous ruling of the court will not prevent the matter from being res judicata." (quoting Syl. Pt. 1, Conley, 301 S.E.2d at 217)).

Accordingly, res judicata applies to each and every count brought by MEA in its complaint, and bars them all from relitigation in this court.

E. Sufficiency of the Claims[13]

Apart from the application of res judicata, the court agrees with the Utilities assertion that MEA's PURPA claims in Counts I through V fail as a matter of law.[14]

1. Count I: Violation of PURPA

Count I alleges the Commission Order violates PURPA and FERC's regulations implementing PURPA by "granting ownership of WV-RECs to Mon Power without requiring the payment of compensation to

_____

[13] MEA asserts that "these issues are inappropriate for a motion to dismiss and are contrary to the agreement of the parties to present the issues to the Court in two steps." Opp'n to Utilities' Mot. J. Pleadings 17. The court's January 10, 2013 bifurcation order, however, did not limit the motions to procedural issues, and the Utilities' arguments are appropriate at this juncture. Moreover, the arguments overlap considerably with what the parties have elsewhere deemed "procedural" arguments, and, in any case, MEA has had an opportunity to respond.

[14] The parties do not address the merits of Count VI, the takings claim, which is only asserted against the Commission. That is, they do not address whether the Commission Order effected an unconstitutional taking. The Commission and MEA do argue over how sovereign immunity might bar relief under Count VI, but they both agree that even after applying sovereign immunity, prospective injunctive relief would still be available against the individual Commissioners. Inasmuch as resolving the sovereign immunity arguments would not eliminate Count VI outright, and because the court dismisses Count VI on res judicata grounds, there is little utility to addressing the sovereign immunity claims, and the court declines to do so.

MEA beyond the avoided cost rate in the parties' PURPA EEP[A]."
Compl. ¶ 67.


The Utilities seek dismissal on the ground that the
Commission Order was purely a matter of state law and did not
violate PURPA.[15]  They argue that the Commission Order assigns
credits based exclusively on state law authority, consistent with
American Ref-Fuel, and that MEA has no grounds for challenging that
decision.  The basis for the decision, the Commission states, was
the assessment of the Portfolio Act's policy goals and the
determination that granting credits to the generators would be an
"un-bargained for windfall" for the generator and would be "unfair
to the utilities and rate-paying public."  Comm'n Reply 6.


MEA relies on "FERC's view" that the Commission Order
violated PURPA by "impermissibly discriminat[ing]" against West
Virginia QFs with PURPA-approved EEPAs.  Opp'n to Comm'n 12.  MEA
quotes the FERC's conclusion that "[t]he only reasonable reading"
of the [Commission] Order is that the West Virginia Commission's
finding . . . is based on the West Virginia Commission's belief
that the PURPA avoided cost rates are overly generous and therefore
must include RECs."  140 F.E.R.C. ¶ 61,223 at ¶ 21.  MEA further

[15] The Commission raised these arguments in the jurisdictional
context, but the court, for reasons discussed above, finds it more
appropriate to consider the arguments with respect to the merits.

57

points to statements that the Commission Order was "inconsistent
with PURPA," 139 F.E.R.C. ¶ 61,066 at ¶ 47, and was "inconsistent
with [FERC's] ruling in American Ref-Fuel that avoided cost rates
'in short, are not intended to compensate the QF for more than
capacity and energy,'" 140 F.E.R.C. ¶ 61,223 at ¶ 21.


        The court agrees with the Supreme Court of Appeals'
reasoning in New Martinsville/MEA.  There, the high court found
that the Commission, in accordance with the legislative intent of
the Portfolio Act and its statutory charge to balance the interests
of the utilities, the public, and the state's economy in making its
assessment, "concluded that the public interest favored awarding
ownership of the credits to the Utilities."  New Martinsville/MEA,
729 S.E.2d at 198.  Thus, the Commission's determination is
consistent with FERC's guidance in American Ref-Fuel that a state
regulator should "find its authority [for assigning RECs] in state
law, not PURPA."  105 F.E.R.C. ¶ 61,007, at ¶ 24.  Other courts
have noted and approved similar public policy grounds for assigning
RECs.  See Ownership of RECs, 913 A.2d 825, 830 (N.J. Super. Ct.
App. Div. 2007) ("[A]s the [state regulator] concluded, assignment
of the Renewable Energy Certificates to appellants necessarily
would have meant that retail consumers would have had to pay more
for electricity.  This result would be unfair to retail consumers,
who have already paid for appellants' electricity, and is entirely

inconsistent with the governing state legislation."); ARIPPA v. Pa
Pub. Util. Comm'n, 966 A.2d 1204, 1214 (Pa. Commw. Ct. 2009)
(accepting the state regulator's "conclu[sion] that the public
interest favored awarding ownership rights in the credits to the
distribution company" where there was "no controlling statutory
language in the applicable version of [the state portfolio
standards act], no controlling precedent, and no guiding language
in the contracts themselves").

          The Commission Order does not conclude, as proscribed by
American Ref-Fuel, that the avoided cost rate inherently
compensates for more than capacity and energy.  As the Supreme
Court of Appeals observed, the Commission "only interpreted the
EEPAs to evaluate the Utilities' obligations under them and their
ownership of the electricity at the time it is generated."  New
Martinsville, 729 S.E.2d at 196.  It did not "interfere[] with the
Generators' federally-granted right to be exempt from certain
utility-type state regulation."  Id. at 196-97.

          In implementing the Portfolio Act, the Commission
necessarily had to consider the circumstances surrounding the PURPA
EEPAs -- agreements that are directly relevant to the Portfolio
Act's policy goals of providing renewable energy at reasonable
prices.  Id. 198-99 ("The purpose of the Portfolio Act is to

encourage the creation and use of energy from alternative sources of energy.  West Virginia Code § 24-2F-2(7) (Repl.Vol.2008 & Supp.2011) states: 'It is in the public interest for the state to encourage the construction of alternative and renewable energy resources facilities that increase the capacity to provide for current and anticipated electric energy demand at a reasonable price.'"). The Commission's finding that PURPA EEPAs are generous and require no additional consideration is merely an assessment of policy concerns.  It does not signify a belief that the EEPAs "inherently" convey RECs. See 105 F.E.R.C. ¶ 61,005, at ¶ 2.  The Commission Order is not based on PURPA and does not modify the EEPA's avoided cost rates.


        FERC's April and September orders do not require the court to reach a different outcome.  As the defendants emphasize, FERC's conclusions are not binding upon this court, though the court does consider FERC's studied and informed pronouncements respectfully.  FERC's opinion that the Commission Order in one respect is inconsistent with PURPA does not diminish the determination of the Commission and the West Virginia Supreme Court that the Commission's conclusion, that the RECs at issue belong to the Utilities, is based on state law.  Having determined that Count I does not assert a cognizable violation of PURPA, the court concludes that MEA is not entitled to declaratory relief.

2. Count II: Federal Preemption

Count II asserts that the Commission Order is preempted by federal law in that it is contrary to and inconsistent with the Commission's PURPA § 210(f) implementation requirement.

As stated by the Second Circuit in <u>Wheelabrator</u>, "The FERC decision in <u>American Ref-Fuel</u> does not evince an intent to occupy the relevant field - namely, the regulation of renewable energy credits. Rather, it explicitly acknowledges that state law governs the conveyance of RECs." 531 F.3d at 190. This court has concluded that West Virginia state law -- particularly the W.Va. Portfolio Act -- appropriately governed the Commission's conveyance of RECs. The Commission Order is consistent with PURPA, and MEA has failed to state grounds for its preemption claim.

3. Count III: Exemption of QFs from State Regulation

In Count III, MEA seeks a declaration that the Commission Order violates PURPA's exemption of QFs from state laws relating to utility-type regulation. MEA asserts that the Commission's "decision that it 'has the jurisdiction and authority to deem' MEA's facility certified . . . to generate WV-RECs exerts impermissible 'financial' and 'organizational' regulation of MEA." Compl. ¶ 79. The Utilities contend that this count fails because

61

certifying the MEA facility would not amount to the "management" of MEA.

The court does not agree that the Commission's certification of the Morgantown facility constitutes utility-type regulation.  New Martinsville/MEA is again persuasive.  That court aptly found that since the Utilities owned the credits "in the first instance," unilateral certification by the Commission was the "only mechanism by which the [Utilities] can receive certification that the energy they are purchasing satisfies the requirements of the Portfolio Act."  New Martinsville/MEA, 729 S.E.2d at 200.

Given this state-law justification, the court agrees with the state supreme court's further conclusion that the decision was "simply an extension of [the Commission's] jurisdiction over public utilities and the authority conferred upon it by the Portfolio Act."  New Martinsville/MEA, 729 S.E.2d at 200.  It "provid[ed] a mechanism for the owner of the energy, the Utilities, to receive certification that the energy they are purchasing qualifies for the purpose of satisfying the requirements of the Portfolio Act."  Id.; see also Comm'n Order 42 (recognizing the need "to allow the [Utilities] to seek certification of the credits we have determined they own" given the "unusual difficulty").  Rather than regulating the organizational or financial aspects of the Morgantown facility,

its certification merely recognizes the Utilities' compliance with the Portfolio Act. Count III fails to state a claim of utility-type regulation.

### 4. Count IV: PURPA's Anti-Discrimination Provision

As noted, Count IV asserts that the Commission Order violates PURPA § 210(b) and 18 C.F.R. § 292.304(a)(1) by creating a rate for the purchase of energy that discriminates against QFs. PURPA regulation 18 C.F.R. § 292.304(a) provides that "[r]ates for purchases shall: (i) Be just and reasonable to the electric consumer of the electric utility and in the public interest; and (ii) Not discriminate against qualifying cogeneration and small power production facilities." MEA contends that the Commission Order is discriminatory against QFs because it concludes that the PURPA EEPAs convey the credits whereas, under state law, non-QF generators are able to sell their electricity while retaining the credits associated with the energy they generate. Id. ¶ 86.

MEA's characterization of state law as discriminatory appears to arise from a statement in the Commission Order that "[t]he unbundling provision in Rule 5.6 of the Commission Portfolio Standard Rules cannot reasonab[ly] be applied retroactively; it was intended to apply prospectively to agreements for the purchase of electricity entered [into] after January 4, 2011, the effective

date of the Rules." <u>Comm'n Order</u> 53.  According to MEA, this
statement means that a non-utility generator that is not a QF under
PURPA with a post January 4, 2011 contract gets to keep its RECs,
because under the rules it can unbundle the RECs from the power it
sells to a utility and sell those RECs separately.  Pl.'s Resp.
Utilities' Mot. J. Pleadings 23.  While that may be true, MEA fails
to show how such a rule is discriminatory against QFs.  If the
Commission Order were to discriminate against MEA, it must do so
with respect to a similarly situated non-QF, that is, a facility
not qualified under PURPA that had a long-term contract to sell
power that it entered into before the effective date of the rules.
The Commission Order says nothing about a non-utility non-QF that
had a long-term contract to sell power that it entered into before
January 4, 2011, nor does the Commission order address REC
ownership for QFs that have <u>not</u> entered into a contract before
January 4, 2011.  Indeed, parties fitting those descriptions were
not before the Commission.  The Commission Order merely states that
its unbundling rules were not meant to apply to preexisting
contracts, a ruling that depends not upon QF status, but upon
whether a non-utility generator entered into an energy sale
contract before the effective date of the rules.


    In addition, the Utilities make a different argument for
dismissing Count IV.  They argue that the anti-discrimination

provision prohibits discrimination in the setting of cost rates, not in the determination of REC ownership. REC ownership, they argue, is not controlled by PURPA and is a matter of state law according to American Ref-Fuel. They contend that because the Commission Order determined REC ownership and did not set cost rates, it cannot violate the anti-discrimination provision. The court agrees. Having already concluded that the Commission Order assigned credits as a matter of state law and not as a modification of EEPA avoided cost rates required under PURPA, there is no change in any EEPA rate that could be deemed discriminatory. Count IV fails to state a claim.

### 5. Count V: Injunctive Relief

Count V merely asserts that "[b]ecause the [Commission] Order violates PURPA, MEA is entitled to an Order enjoining the Commission from enforcing the [Commission] Order." Compl. ¶ 89. Since the court finds the Commission Order to be consistent with PURPA, injunctive relief is unwarranted.

IV.

It is, accordingly, ORDERED as follows:

1.    The motion to dismiss, filed by the Commission and the
Commissioners on December 7, 2012, be, and it hereby is,
granted;

2.    The Utilities' motion for judgment on the pleadings,
filed January 25, 2013, be, and it hereby is, granted;
and

3.    This action be, and it hereby is, dismissed and stricken
from the docket.

The Clerk is directed to transmit copies of this order to
all counsel of record and any unrepresented parties.

ENTER: September 30, 2013

John T. Copenhaver, Jr.
United States District Judge

66